```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: July 23, 2009
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JOHN FITZGERALD KENNEDY, HILDA          :
KENNEDY, WILLIAM HENRY KENNEDY,          :
                                         :
                    Plaintiffs,          :    08 Civ. 3969 (PAC)
                                         :
        - against -                      :    OPINION & ORDER
                                         :
RELATED MANAGEMENT and THE RELATED       :
COMPANIES,                               :
                                         :
                                         :
                    Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiffs John Kennedy, Hilda Kennedy, and their adult son William Kennedy (the

"Kennedys") bring a suit for discrimination under the Fair Housing Act ("FHA"), 42 U.S.C. §§

3601 et seq., and the New York State Human Rights Law, Executive Law §§ 290 et seq. The

Kennedys claim that Defendants Related Management and The Related Companies (together,

"Related") rejected the Kennedys' housing application because John Kennedy has Acquired

Immune Deficiency Syndrome ("AIDS") and Hilda Kennedy is visually impaired. Both parties

move for summary judgment. For the reasons that follow, the Kennedys' motion for summary

judgment is DENIED and Related's cross-motion for summary judgment is GRANTED, except

for its request for attorney's fees.

## BACKGROUND

John Kennedy is 53 years old and lives in Queens, New York. He has HIV/AIDS. Hilda

Kennedy, John's wife, is 77 years old and is visually impaired. William Kennedy is Hilda and

John's 27-year-old son. Defendant Related develops, owns, and manages a residential apartment

building, Riverwalk Landing #4 ("RL4"), located at 425 Main Street on Roosevelt Island in

Manhattan. This action stems from Related's rejection of the Kennedys' application to rent an apartment in RL4.

RL4 is a luxury rental property constructed under the terms of the City's R10 Inclusionary Housing Program ("R10 Program"). Briefly stated, the R10 Program permits development of an apartment building with up to 20% more square footage than the City's zoning laws would normally allow, in return for using some of the additional units for affordable (i.e. non-luxury priced) apartments for income-eligible tenants. As one might imagine, affordable units in a luxury building at a prime location in the city are highly desirable, and the demand for these units is always far greater than the available supply. Because one of the R10 Program's goals is ensuring economic integration, the City requires that units be affordable to individuals and families at or below 80% of the area's median income. (See Affidavit of Vera Horn Silver ("Silver Aff.") Ex. D at 4-5.) Eligibility is determined by a lottery followed by an individualized income verification process to assure that the units are awarded only to the targeted population. There are severe consequences for failure to comply with the terms of the R10 Program. If a unit is awarded to an applicant outside the targeted population the owner could potentially lose its zoning benefit, resulting in lost profits, and lose its ability to use various city, state, and federal housing subsidy programs and tax incentives to finance affordable units. The Department of City Planning and the Department of Housing Preservation and Development ("HPD") oversee the R10 Program and monitor participating owners to ensure compliance with the R10 guidelines.

In 2007 RL4 had 25 units available under the R10 Program. (Id. Ex. H.) The posted advertisement for the units stated that certain categories of eligible applicants would receive preference for some of the 25 apartments. (Id.) For instance, there was a locational preference

2

for eligible residents of Manhattan Community Board #8 (50% of the units), and eligible households containing people with visual impairments would receive preference for 2% of the units.[1] (Id.) The income-eligibility range for two-bedroom apartments (suitable for three to four individuals) was between $47,858 and $51,040. (Id.) Related determined applicant eligibility for the lottery winners by a two-step process. First, Related determined whether the applicant was income eligible based on the information in the application. (Id. Ex. E.) Second, Related processed the application further to determine if the applicant was ineligible based on Related's Selection/Rejection Screening Procedures. (Id.)

John, Hilda, and William Kennedy applied to rent a two-bedroom apartment in Related's RL4 building on May 14, 2007, and Related selected their application through a lottery. (First Amended Complaint ("Am. Compl.") ¶¶ 14, 15.) Related gave the Kennedys' application a processing preference as a household that possibly qualified for the R10 Program because the application indicated that Hilda Kennedy had a visual impairment. (See Silver Aff. ¶ 7.) Luz Cruz, an affordable-housing coordinator at Related, initially reviewed the Kennedys' application. (Deposition of Luz Cruz ("Cruz Dep.") 35:22-23.) The application indicated that the Kennedys had a total annual household income of $50,972, which placed them within the income eligibility range. (Silver Aff. Ex. F.) Related interviewed the Kennedys based on their claim that they were income eligible. (Am. Compl. ¶¶ 16-17.) During the interview, the Kennedys disclosed that John received public assistance from the New York City Human Resources Administration ("HRA"). (Cruz Dep. 45:16-24; Silver Aff. ¶ 9.) The Kennedys had previously failed to disclose this required and pertinent income information on their application to Related. (Id. Ex. F.)

---

[1] The record is not clear on how people with visual impairments could get preference for 2% of 25 units, as that percentage would equal less than one unit.

3

On August 3, 2007, Related requested that the Kennedys provide income information regarding John Kennedy's public assistance award. (Silver Aff. ¶ 9; Plaintiffs' Memorandum of Law in Support of its Motion for Summary Judgment ("Pl.") Ex. E.) HRA did so, but before Related received Kennedy's Budget Letter from HRA, Ms. Cruz determined that based on their application, the Kennedys qualified under Related's annual household income range. (Cruz Dep. 45:02-05.) Ms. Cruz also determined that the Kennedys did not violate Related's screening criteria for a two-bedroom apartment with a household size of three in RL4.[2] (Id.)

On August 14, 2007, Ms. Cruz submitted the Kennedys' application to her supervisor, Vera Horn Silver, for final approval. (Id. 45:08-10.) Ms. Cruz then took time off from Related, and Related transferred the Kennedys' application to Anne Schneider, another affordable-housing coordinator at Related, to complete the verification process. (Id. 38:04-40:06; Deposition of Anne Schneider ("Schneider Dep.") 11:03-20.) Related received Kennedy's Budget Letter on September 6, 2007. (See Silver Aff. Ex. J.) The Letter was stamped with the acronym "HASA," indicating that John Kennedy had HIV/AIDS. (Id.) Related was aware that HASA is an acronym that HRA uses to indicate that an individual has HIV/AIDS. (Silver Aff. ¶ 19.)

Kennedy's HRA Budget Letter indicated that he was entitled to $2,961.60 in public assistance. (Id. Ex. J at 2.). The Kennedys had not included this amount of public assistance on their apartment application. Had it been included, the Kennedys would have exceeded the $51,040 maximum annual income, making them ineligible for the apartment they sought. To solve their income-eligibility issues, the Kennedys claimed that John Kennedy's HRA public

---

[2]     Upon further review of the Kennedys' application, Related determined that the Kennedys' annual income for 2007 was $49,274.20 and not $50,972, the amount the Kennedys initially reported on their application. (See Silver Aff. Ex. G at 1.) Based on this calculation, the Kennedys still qualified under Related's predetermined annual income range.

4

assistance would cease once Related granted them the apartment. (Am. Compl. ¶ 20.)

Subsequently, Related attempted to confirm that John Kennedy's HRA public assistance would in fact cease if Related granted the apartment to the Kennedys. Related needed this information to verify the Kennedys' income eligibility. Related called Chinyere Okigwe, Kennedy's case manager at HRA, to confirm. (See Silver Aff. ¶¶ 10, 11.) Upon further review of the HRA Budget Letter, Related realized that there was a further discrepancy between the Kennedys' application, which listed John, Hilda, and William on the application, and John Kennedy's HRA Budget Letter, which was calculated as if he were single and living alone. (See id. ¶ 11.) HRA had calculated John Kennedy's public assistance award without taking into account Hilda Kennedy's income because Kennedy never informed HRA that he was married or that anyone else lived with him. (Deposition of Chinyere Okigwe ("Okigwe Dep.") at 23:13-16; Affidavit of Warren Herland ("Herland Aff.") Ex. Y.) John Kennedy's HRA public assistance award would have differed and presumably been less than his HRA Budget Letter allocated if he had made full disclosure that he was living with Hilda and Hilda had Social Security income.[3] (See Okigwe Dep. at 77:15-21.) According to HRA, even if John Kennedy applied for public assistance as a single applicant, which he was entitled to do, HRA still required him to report any income his wife earned if she lived with him. (Id. at 77:10-21.)

On September 12, 2007, Related denied the Kennedys' application via a standard form rejection letter. (Silver Aff. Ex. K.) Related's rejection letter stated:

> We are sorry to inform you that your application has been rejected. You have not met the standard screening criteria established by the owners in the following area(s):
>
> \*     \*     \*

---

[3] The record does not reflect the formula that HRA used to calculate the amount of public assistance to which John Kennedy was entitled.

> (x) Information/documentation collected in the processing of this application raised doubt about your ability to abide by the terms of our lease, as evidenced by your:
>
> \*     \*     \*
>
> (x) Provisions of false information regarding income and/or other information requested with your application <u>or failure to supply requested information</u>.

(<u>Id.</u>) (emphasis in original).

On September 21, 2007, the Kennedys appealed Related's denial in a letter and requested to meet with Related. (Pl. Ex. I.) On October 2, 2007, Related denied the Kennedys' appeal via letter based on the Kennedys' failure to provide income information to a third party—in this case HRA. (Silver Aff. Ex. L.) Related never met with the Kennedys to discuss the denial.

The Kennedys filed this suit on April 28, 2008 and amended their Complaint on July 7, 2008. The Kennedys moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on December 31, 2008. Related filed its cross-motion for summary judgment on January 29, 2009.

## DISCUSSION

### I. Applicable Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" for summary judgment purposes if it "'might affect the outcome of the suit under the governing law.'" <u>Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown</u>, 294 F.3d 35, 45 (2d Cir. 2002) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). A "genuine" issue as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> (citation and quotation omitted). The movant bears the initial burden to demonstrate the absence of a genuine issue of material fact based on the

6

"pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When determining whether the movant met its burden "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. Once the moving party has met its burden the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).

## A. Discrimination under the FHA[4]

The FHA makes it unlawful "[t]o discriminate in the sale or rental, . . . a dwelling to any buyer or renter because of a handicap of (A) that buyer or renter; (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that buyer or renter." 42 U.S.C. § 3604(f)(1). Under the FHA, a defendant can be exposed to three theories of liability: (1) disparate treatment; (2) disparate impact; and (3) failure to make a reasonable accommodation. City of Middletown, 294 F.3d at 48.

### i. Disparate Treatment Theory

Courts evaluate claims of disparate treatment under the FHA pursuant to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). See Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003). Under McDonnell Douglas the plaintiff bears the initial burden to establish a prima facie case of discrimination. See McDonnell Douglas, 411 U.S. at 802. If the plaintiff establishes a prima facie case of discrimination the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged decision.

---

[4]     The FHA is obviously intended to apply to housing that is generally available to the public. The housing available under the R10 Program is by definition not generally available; rather, it is available to only those within a very narrow band of income eligibility, who also meet other limiting, but socially redeeming, criteria. (See Silver Aff. Ex. H.) The Kennedys do not challenge the limiting eligibility requirements of the R10 Program, and neither party challenges the applicability of the FHA. The Court will apply the FHA standard.

Id. at 802-03. Finally, if the defendant articulates a legitimate, non-discriminatory reason the burden shifts back to the plaintiff to demonstrate that the defendant's reason for the challenged decision is only a pretext for discrimination. See Mitchell, 350 F.3d at 47. "Summary judgment is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination." Id.

The parties dispute whether the Kennedys can establish a prima facie case of disparate treatment. To establish a prima facie case of disparate treatment under the FHA plaintiffs must show that: (1) they were members of a protected class; (2) they sought and were qualified to rent; (3) they were rejected; and (4) the apartment remained available to other renters or purchasers after they were rejected. Id. The Court assumes, as the parties do, that the Kennedys have satisfied the first, third, and fourth elements.[5] The parties disagree about whether the Kennedys were "qualified" to rent—i.e. that they were income eligible under the R10 Program.

Related contends that the Kennedys were not qualified because they were not income eligible under Related's income guidelines. Ignoring for the moment Related's legitimate concern that John Kennedy had not been truthful about his income eligibility, Related's argument is that the Kennedys fail at the prima facie stage because they were, technically, above the income threshold, and thus unqualified. The Kennedys argue that they were qualified because John Kennedy's HRA award would cease once Related granted them the apartment, placing them within the income guidelines.

---

[5]     Related does not contest that John and Hilda are handicapped under the FHA and thus members of a protected class. Other courts have found that plaintiffs who have visual impairments or HIV/AIDS are handicapped under the FHA and thus members of a protected class. Gorham-Dimaggio v. Countrywide Home Loans, Inc., 592 F. Supp. 2d 283, 289 (N.D.N.Y. 2008) (legally blind plaintiff found to be a member of a protected class under the FHA); Ryan v. Ramsey, 936 F. Supp. 417, 421-22 (S.D. Tex. 1996) (plaintiff with AIDS handicapped under the FHA); Support Ministries for Persons with AIDS, Inc. v. Village of Waterford, 808 F. Supp. 120, 130 (N.D.N.Y. 1992) (plaintiffs with AIDS found handicapped under the FHA).

8

To satisfy the "qualified" element for a prima facie FHA claim, the renter must satisfy the applicable criteria that the owner established. See Mitchell, 350 F.3d at 47-48 (plaintiffs were qualified to purchase the property in question because they satisfied defendant's requirement of an 80% mortgage contingency); Woods v. Real Renters Ltd., No. 01 Civ. 269 (MHD), 2007 WL 656907, at *9 (S.D.N.Y. Mar. 1, 2007) (court could not determine whether a plaintiff was qualified for purposes of the FHA because the landlord did not have a specific set of criteria that it used to screen applicants); McDonald v. Coldwell Banker, 543 F.3d 498, 503 (9th Cir. 2008) (relying on Mitchell for the proposition that "[a] 'qualified' purchaser is one who meets the terms of the seller").

Although the Kennedys were technically ineligible for the apartment based on their income, including public assistance, Related continued to process their application under the assumption that John Kennedy's public assistance would cease when Related granted his family the apartment. At such time the Kennedys would have become income eligible. (See Silver Aff. ¶¶ 9, 10; id. Ex. M.) Related's efforts to verify that John Kennedy's public assistance would cease shows that Related continued to work on the issue of the Kennedys' eligibility and believed that the Kennedys might become eligible and "qualified" to rent.[6] The Court finds that the Kennedys were qualified to rent in Related's development for purposes of establishing a prima facie case of discrimination.

The Court now turns to the next McDonnell Douglas factor: whether Related has demonstrated that it had a legitimate, non-discriminatory reason for denying the Kennedys'

---

[6]      Under these facts and Related's continued work on the application, Related cannot claim that the Kennedys were not "qualified" for purposes of establishing a prima facie case under the FHA simply because they were technically income ineligible when they applied. See Mitchell, 350 F.3d at 48 (plaintiffs were qualified despite their failure to provide a mortgage commitment letter because defendants merely requested proof plaintiffs would consummate their offer, which plaintiffs provided); Cleveland v. Bisuito, No. 03 Civ. 6334 (CJS), 2004 WL 2966927, at *5-6 (W.D.N.Y. 2004) (plaintiffs qualified even though they could not pay the entire rent before moving in because parties agreed payment would occur at a later date).

9

application.  Related claims it rejected the application because the Kennedys failed to supply accurate, complete, and consistent information concerning their income, and that this is a legitimate, non-discriminatory reason for denial.  Related argues that an applicant's failure to make accurate and complete financial disclosures to a third party suggests that the applicant will make financial misstatements and omissions to Related.

The R10 Program has strict income requirements, so Related was well within its rights to insist on accurate income information.  The fact that the Kennedys provided different information concerning their income and whether they lived together or apart suggested that they were not telling the complete truth about their income.  The Kennedys' disclosures seem to vary depending upon their access to benefits.  For example, John Kennedy lived by himself to qualify for HRA benefits, but he lived with Hilda in order to get an apartment.

The Kennedys, however, argue that Related's reason is invalid because Related's selection criteria did not specifically mandate that the Kennedys provide accurate and complete income information to third parties, in this case HRA.  This argument has no merit.  Related's policy is to require full and accurate disclosure to third parties.  In a letter from Ms. Silver to William Kennedy dated October 2, 2007, Ms. Silver informed the Kennedys that Related requires "that all members of an applicant household provide complete financial and household information to all necessary agencies, such as . . . HRA." (Silver Aff. Ex. L.)  Additionally, in an e-mail dated October 9, 2007 from Ms. Silver to Joe Toris at HPD, the agency that supervised the R10 Program, Ms. Silver informed Mr. Toris that Related rejected the Kennedys because: "On a consistent basis the following is applied to each application . . . a requirement that an applicant household has made full and complete disclosure of financial circumstances to all required agencies an [sic] authorities, such as . . . HRA." (Id. Ex. M.)  The Kennedys violated

Related's policy when they provided different information to HRA and Related. The Kennedys' disclosures were inconsistent, inaccurate, and incomplete. Related has met its minimal burden of production to show that it had a legitimate, non-discriminatory reason for denying the Kennedys' application. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993); Frazier v. Rominger, 27 F.3d 828, 832 (2d Cir. 1994) (citing Hicks, 509 U.S. at 509). The burden shifts back to the Kennedys to establish that Related's reason is a pretext for discrimination.

The Kennedys contend that Related's reason for denying their application is pretextual on three grounds: (1) the proffered reason was false; (2) a fact-finder could infer discrimination based on Related's knowledge that John Kennedy had AIDS and that Hilda Kennedy is visually impaired; and (3) Related impermissibly scrutinized their application.

First, the Kennedys argue that Related's rules and regulations do not allow Related to deny an applicant for a failure to supply requested information to a third party. The Court has already discussed and rejected this argument.

Second, the Kennedys argue that because Related knew that John Kennedy had AIDS and that Hilda Kennedy was visually impaired, a reasonable person could infer that Related's proffered reason was a pretext. This argument is pure speculation. There is no evidence whatsoever that could lead a reasonable fact-finder to conclude that Related discriminated against the Kennedys based on animus. The Court assumes that Related knew about John's HIV/AIDS status based on HRA's disclosure, but awareness does not amount to animus. Indeed, the only evidence in the record is that Related has numerous tenants with AIDS. (See Silver Aff. ¶ 19.) While not dispositve, this further supports the Court's conclusion that a fact-finder could

not reasonably conclude that Related denied the Kennedys' application based on animus against people with AIDS.[7] See Woods, 2007 WL 656907, at *11.

Finally, the Kennedys argue that Related engaged in a suspiciously detailed review of their application, which suggests that Related treated the Kennedys differently than other applicants. The Kennedys argue that because Ms. Cruz submitted their application to her supervisor for final approval, Related should not have subsequently attempted to confirm John Kennedy's Budget Letter with HRA. This argument is without merit. Related's Selection/Rejection Criteria indicated that Related would not approve an application until Related verified an applicant's income information, which required Related to obtain John Kennedy's HRA Budget Letter. (See Silver Aff. Ex. E.) When Ms. Cruz initially approved the Kennedys' application she did so without the benefit of the HRA Budget Letter. Related was only following its own review procedures in seeking further information about the Kennedys' income status.

Related's need for a thorough investigation of the application and income verification is not of their own making. Rather, it is a City-imposed requirement under the R10 Program. Failure to meet the program requirements for tenant income eligibility exposes Related to substantial fines and penalties, as well as loss of zoning bonuses and tax benefits. Measured against Related's exposure, it was entirely appropriate to have a thorough and complete verification of income. This was particularly so with the Kennedys, whose application raised numerous red flags about their candor, truthfulness, and evident willingness to distort their income information and domestic status in order to qualify for public benefits. The fact that the Kennedys fooled HRA does not mean they were entitled to fool Related too.

---

[7]     Even in his own deposition, John Kennedy stated that he did not believe that Related discriminated against him because he has AIDS, but rather that Related simply "didn't follow the rules." (See Herland Aff. Ex. S 33:13-20.)

12

There were clear discrepancies between the information that John Kennedy provided to HRA and the information provided to Related. In order to get HRA benefits Kennedy applied as if he were single and living alone. Then, when convenient to receive a luxury apartment at a non-luxury price, the Kennedys applied to Related as a three-member household, which they needed to do to qualify under the applicable income range. Further, the Kennedys' application to Related was not truthful. The application specifically required the Kennedys to provide information regarding any public assistance they received, but the Kennedys failed to include John Kennedy's HRA public assistance award in their application. Given the income eligibility requirements and the severe consequences for failure to comply with the R10 Program, Related had to have a rigorous selection policy. Pursuant to the application of that policy, Related discovered the Kennedys' history of providing inaccurate and incomplete information.[8]

The Kennedys also argue that Related circumvented its own policy of having only one affordable-housing coordinator responsible for an application throughout the verification process, and that the transfer of the Kennedys' application from Ms. Cruz to Ms. Schneider raises red flags. But the Kennedys fail to present any evidence that Related transferred the Kennedys' application in an effort to discriminate against them. The only explanation on record is benign. Certainly there is no legal requirement that the Kennedys should benefit from an incomplete review. Ms. Cruz left Related and the Kennedys' application had to be attended to; therefore Related asked Ms. Cruz's successor to assume responsibility for the application. Related's transfer of the Kennedys' application to a different affordable-housing coordinator cannot possibly result in a finding of discrimination.

---

[8]    Related learned during discovery of other potentially false claims to the IRS, relating to William Kennedy claiming Hilda Kennedy as his dependent on IRS filings from 2004-06 and claiming that they lived in the same home at 1672 Grove Street in Queens. (See Herland Aff. Ex. Z.) This filing again conflicts with the information provided to HRA by John Kennedy that he claimed to live alone at that address.

13

Finally, the Kennedys argue that a jury could infer discrimination because Related did not grant the Kennedys an in-person meeting to review their denial. This argument is, again, pure speculation, and the jury will not be invited to speculate with the Kennedys. Their failure to provide accurate facts and their willingness to manipulate income information in order to get benefits is fatal to their argument that Related's proffered reason was a pretext for discrimination. See Roffman v. Knickerbocker Plaza Assocs., No. 04 Civ. 3885 (PKC), 2008 WL 919613, at *15 (S.D.N.Y. Mar. 31, 2008).

### ii. Disparate Impact Theory

The Kennedys also claim that Related violated the FHA based on a disparate impact theory. A "[d]isparate impact analysis focuses on facially neutral practices or policies that may have a discriminatory effect." Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 574 (2d Cir. 2003). To establish a prima facie case, the plaintiff must show: "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." Id. at 574-75 (emphasis and internal quotation and citation omitted).

The Kennedys cannot establish a violation of the FHA under a disparate impact theory. The record is void of any evidence that Related caused a significantly adverse or disproportionate impact on people who either have AIDS or who are visually impaired.

### iii. Reasonable Accommodation

The Kennedys argue that Related failed to make a reasonable accommodation for the Kennedys to qualify for an apartment in RL4, which they are entitled to because Hilda Kennedy is visually impaired. This is absolute nonsense; Hilda's visual impairment was the very reason Related granted the Kennedys' application a processing preference. (Silver Aff. ¶ 7.) The

14

Kennedys' failure to verify their income justifies Related's denial of their application, and has nothing to do with Hilda's visual impairment.

## B. State Law Claim

The New York State Human Rights Law also makes it unlawful for "the owner . . . or other person having the right to sell, rent or lease a housing accommodation" to discriminate against anyone because of a disability. See N.Y. Exec. Law § 296(5)(a). The Court's analysis of housing discrimination claims under § 296 is the same as housing discrimination claims under the FHA. See Mitchell, 350 F.3d at 47 n.4; Resnick v. 392 Cent. Park W. Condo., No. 07 Civ. 1988 (LBS), 2007 WL 2375750, at *3 (S.D.N.Y. Aug. 14, 2007); Okolie v. Paikoff, 589 F. Supp. 2d 204, 221 (E.D.N.Y. 2008). Accordingly, Related is also entitled to summary judgment on the Kennedys' state law discrimination claims.

## CONCLUSION

For the reasons stated, the Kennedys' motion for summary judgment is DENIED and Related's cross-motion for summary judgment is GRANTED, except for its request for attorney's fees. The Clerk of the Court is directed to enter judgment for Defendants and close this case.

Dated: New York, New York
       July 23, 2009

                                  SO ORDERED

                                  PAUL A. CROTTY
                                  United States District Judge

15